**UNION INDEMNITY CO. v. MALLEY et al.**
**(No. 3448.)**

Court of Civil Appeals of Texas. Texarkana. Dec. 15, 1927.

Rehearing Denied Jan. 19, 1928.

1. **Master and servant** ⊜⇒375(1)—**Death of night watchman inhaling gas in toolhouse, entered for purpose of sleeping, held not compensable, as within "scope of employment" (Workmen's Compensation Act [Vernon's Ann. Civ. St. 1925, arts. 8306–8309]).**

In suit to set aside award under the Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, arts. 8306–8309), death of night watchman, caused by inhaling carbon monoxide gas emitted by gasoline engine in toolhouse, *held* not to have occurred within "scope of employment," where watchman was found dead in sleeping position with his hat hanging on wall, his raincoat pulled over him, and door partly closed, since circumstances indicated he had gone to toolhouse for purpose of sleeping, which constituted departure from line of duty.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Scope of Employment.]

2. **Master and servant** ⊜⇒403—**Compensation claimants had burden to prove accident occurred in scope of workman's employment (Workmen's Compensation Act [Vernon's Ann. Civ. St. 1925, arts. 8306–8309]).**

In action to set aside award under Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, arts. 8306–8309), original claimants, sued as defendants, had burden of proving that injury causing death originated in service of deceased's employer or was sustained while workman was acting in furtherance of master's business or affairs.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Suit by the Union Indemnity Company against Mrs. Mary Malley and others to set aside an award in compensation proceedings. From an adverse judgment, plaintiff appeals. Reversed and rendered.

Vinson, Elkins, Sweeton & Weems, of Houston, for appellant.

Johnson & McConnell, of Houston, for appellees.

HODGES, J. In May, 1926, H. L. Holcomb was engaged in making a "fill" at the docks of the Southern Pacific Company at Clinton, in Harris county, Tex. He was doing business under the name of the Houston Excavating Company. He employed a number of men, and carried a policy of insurance issued by the appellant under the terms of the Workmen's Compensation Law of this state (Vernon's Ann. Civ. St. 1925, arts. 8306–8309). Among his employees was F. J. Malley, the husband of the appellee Mrs. Mary Malley. F. J. Malley was employed principally as a night watchman, and it was his duty to prevent molestation of the property used by his employer in the prosecution of his work. The premises placed under the care of Malley extended along the bank of the ship channel about 1,800 feet. There was situated on the premises of Holcomb what was called a "portable toolhouse," where tools and miscellaneous articles used in the prosecution of the work were stored. This toolhouse was made of corrugated iron and was 5 feet wide by 5 feet high and about 15 feet long. It had double doors at one end, extending the entire width, and one door on the side. At the front end of the toolhouse was a "built-in" gasoline engine. The exhaust pipe of this engine was at the door, and so arranged that when the door was closed the engine exhausted inside of the toolhouse. On the night of May 14, 1926, Malley was left alone in charge of the premises about 7:30 or 8 o'clock. The following morning, between 6 and 7 o'clock, he was found lying on the floor of the toolhouse, dead. His widow presented a claim to the Industrial Accident Board, in accordance with the provisions of the Workmen's Compensation Law, and an allowance was made in her favor. The appellant later filed this suit in the district court of Harris county to have that award set aside upon the ground that the evidence was insufficient to show that the death of Malley was caused by accidental injuries sustained while acting within the scope of his employment.

The case was submitted to a jury upon special issues. The findings of the jury were, in substance, that Malley died as a result of a personal injury which originated in the work or business of his employer and while he was engaged in or about the furtherance

------

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes .

of the affairs of his employer. The jury also found that the average weekly wage of Malley amounted to $31.50, and that Mrs. Malley was entitled to a lump sum settlement. A judgment was rendered in accordance with those findings.

[1] The first, and what appears to be the principal, ground presented for a reversal of the judgment, is that the evidence shows that the injury which caused the death of Malley was not a compensable one under the provisions of the Workmen's Compensation Act, because the injury did not originate in the service of his employer, or while he was engaged in the furtherance of the affairs or business of his employer. It is contended that it conclusively appears from the attending circumstances that Malley died from suffocation after he had abandoned his duty and had voluntarily gone to sleep in the toolhouse.

In connection with the issues submitted to the jury the court gave the following explanatory charge:

"It is the duty of the night watchman to stay awake; and if the deceased in this case went into the toolhouse for the purpose of going to sleep and did so intentionally, it would be a departure from his line of duty; or if he went in there for any other purpose and fell asleep unaffected by carbon monoxide gas, that would amount to a departure from his line of duty."

It is apparently conceded that Malley's death was due to suffocation caused by inhaling carbon monoxide gas emitted by the gasoline engine in the toolhouse. Why Malley went into the toolhouse, and what he was doing when overcome by the gas, can be ascertained only by considering the surrounding circumstances. Mrs. Malley testified that he had been on duty the night before, and had slept till about 3 o'clock p. m. on May the 14th. He was a young man in apparent good health. There is no evidence that he was subject to any special ailment, or that on the night of his death he had been subjected to any violence which tended to' disable him. The testimony of Holcomb and his workmen showed that at the close of the day a heavy shower of rain had fallen, which made it impracticable to prosecute the work during the night. Because of the rain all of the employees except Malley left the premises and went to their homes. The shower, however, was of short duration. Immediately after it fell the weather became cold and disagreeable. When the other employees left the place the doors of the toolhouse were open, and· there is some evidence tending to show that the doors had been wired so as to keep them open. The gasoline engine was used to operate a light plant which illuminated the grounds when the men were at work at night. It was Malley's duty to start and stop that engine. That could be done from the outside, and there was no occasion for going inside of the toolhouse for that purpose. It was his

duty to turn off the lights about 8:30 o'clock p. m. and start a water pump located a short distance from the toolhouse. It was also his duty to remain awake, watch the property of his employer, and guard it against molestation by trespassers. The next morning, when other employees returned, they found the lights still burning, but the gasoline motor was not running. The switch was turned on, but the fuel tank was empty. Apparently the motor had been running and stopped because the fuel supply was exhausted. One of the witnesses who discovered Malley early the next morning testified:

"When I got down to the portable toolhouse next morning, I saw Mr. Malley lying there on his back, dead, with his head resting on the cable coils for a pillow; that is, the cable coil was right across the back of his neck when I found him. He was lying there in a sleeping position. He was lying stretched out on his back. His hat was hanging on the wall. He had a raincoat pulled up over him along about his chest, as best I remember. The doors were partly closed."

Other witnesses testified to the same effect. There ·was nothing to indicate that Malley went into the toolhouse to perform any service for his employer. The question then is, What is the most probable conclusion to be drawn from those facts? All the circumstances are consistent with the inference, if they do not clearly indicate, that Malley entered the toolhouse early in the night and for the purpose of seeking shelter from the discomforts of the weather; that while in the toolhouse he voluntarily lay down on the floor to rest, if not to sleep, and later did sleep; that while asleep he was suffocated by the gas emitted through the exhaust of the gasoline engine. Hanging his hat on the wall indicated a deliberate purpose to remain some time in the house, and is consistent with an intention to lie down and sleep. His position on the floor indicated that it was consciously and voluntarily assumed. Using the raincoat as a covering indicated conscious preparation for rest and sleep. The final conclusion follows that Malley voluntarily exposed himself to the poisonous gas for a purpose purely personal to himself—for his own comfort—and died while sleeping. That, if true, was manifest departure from his duty to his employer.

The testimony is undisputed that Malley had been warned of the dangerous consequences of exposure to that gas, and had been instructed not to go into the toolhouse while the doors were closed and the engine was running. There is in this appeal no contention that he was ignorant of the danger to which he had exposed himself. An expert, whose testimony was not disputed, testified that, in a place such as the toolhouse was described to be with the doors partially closed, it would require about 20 minutes for one

exposed to feel the effects of the escaping gas, and about an hour or more for it to produce suffocation. That precludes the inference that Malley was suddenly and unexpectedly overcome by the gas.

Among the cases cited and relied on by the parties in this appeal the most appropriate seems to be a decision by a California court. Roebling's Sons Co. v. Industrial Accident Commission, 36 Cal. App. 10, 171 P. 987. In that case a night watchman, whose duties were to guard the manufacturing plant against intruders, was found dead in a washroom on the premises; death apparently resulting from carbon monoxide gas poisoning. The evidence tended to show he was intoxicated that night. The manager of the company testified he could have no business in the washroom unless it was to use the toilet. The proof further showed that the watchman had not been forbidden to use the washroom and heating plant when he so desired. The court, in holding there was no liability, said:

"In order to sustain the finding of the commission we must conclude it to be a reasonable proposition fairly indicated by the proof that Bundshu, not being affected by any condition arising from his own misconduct, lighted the heater, and that the fumes of the gas overcame him before he was able to protect himself and avoid being suffocated. The expert testimony given before the commission showed that death was due to poisoning produced by carbon monoxide, that being a constituent of illuminating gas in its unburned state. If we are to assume another state of facts, to wit, that Bundshu on the night in question was intoxicated, that neglectful of his duty he went into the washroom with intent to sleep, that he there lighted the heater and tightly closed the door and windows and lay down upon the bench, and that under such conditions was killed, it must at once be said, we think, that the death was not such an accidental death as was a reasonably probable incident of the employment; and the last conclusion we feel is the one which the evidence, with little uncertainty points to. But it is not essential to the case of petitioners that the conclusion last suggested be one which the evidence clearly established. The burden of proving, as has often been said in the decisions both of our own Supreme Court and courts of last resort in other states where similar conditions of statute exist, that the injury for which compensation is asked was suffered in the course of the employment and arose out of the employment, is upon the claimant. Where various theoretical conclusions may be drawn from the state of facts established, each being equally plausible, some indicating that the injury may have arisen out of the employment, and others that the misconduct of the person injured was the producing cause, then it may not be said that the evidence is sufficient to sustain the case of him upon whom the burden of proof rests. A finding in such a case in favor of the claimant is said to be speculative. * * *

"And we may remark that the uncontradicted evidence in this case indicates, if we are to choose between conflicting speculative deductions, that on the night in question the deceased willfully stepped aside from the performance of the duties which his employment laid upon him and invited by direct action on his part the occurrence of the detrimental causes which produced his death. In our opinion, the conclusion of the commission is not supported by sufficient evidence."

[2] Under our statute the appellees had the burden of proving that the injury which caused the death of Malley originated in the service of his employer, or was sustained while he was acting in furtherance of his employer's business or affairs. It cannot be said that this requirement was met when the most probable inferences to be drawn from all the evidence leads to a contrary conclusion.

Because of the insufficiency of the evidence to support the verdict of the jury, the judgment will be reversed, and judgment here rendered for the appellant.